UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR BLANK #157960,

    *Plaintiff*,

v.

CORIZON HEALTHCARE OF
MICHIGAN, KEITH PAPENDICK,
TERRENCE WHITEMAN, and
CHARLES JAMSEN,

    *Defendants*.
_____/

CASE NO. 2:14-CV-13235

DISTRICT JUDGE NANCY G. EDMUNDS
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 24)

### I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED**.

### II.    REPORT

#### A.    Introduction

Plaintiff Arthur Blank, a state prisoner, filed this *pro se* federal civil rights action under 42 U.S.C. § 1983 on August 20, 2014. (Doc. 1.) An amended complaint was filed on December 24, 2014 (Doc. 6), and Defendants answered the amended complaint on March 23, 2015. (Doc. 19.) Plaintiff was incarcerated by the Michigan Department of Corrections ("MDOC") at the Gus Harrison Correctional Facility (ARF) in Adrian, Michigan, and the G. Robert Cotton Correctional Facility (JCF) in Jackson, Michigan when the alleged Eighth Amendment violations took place.

(Doc. 1 at 6; Doc 15 at 2.) Defendants Papendick, Whiteman and Jamsen are medical doctors. (Doc. 6 at ID 22.) Plaintiff complains that Defendants violated his Eighth Amendment right to be free from deliberate indifference to serious medical needs, i.e., "paroxtsmal atrial fibrillation, coronary artery disease, [and] congestive heart failure[.]" (Doc. 6 at ID 36.) Plaintiff alleges that "Defendants, although providing some measure of care and treatment, have render[ed] inadequate care or have made the decision to take an easier less efficacious course of treatment, this subjecting the Plaintiff to unnecessary and wanton infliction of pain and suffering." (*Id.*)

On July 21, 2015, Defendants filed this motion for summary judgment, contending that there is no genuine issue of material fact because Plaintiff has failed to show that Defendants were deliberately indifferent to his serious medical needs. (Doc. 24.) After having been granted an extension of time, Plaintiff filed a response to Defendants' motion on November 9, 2015, arguing that he has identified specific facts that can be established by admissible evidence and which demonstrate that a genuine issue of material fact exists as to whether Defendants were deliberately indifferent to a serious medical need. (Doc. 34.) On November 23, 2015, Defendants filed a reply, reasserting that Plaintiff has only stated a difference of opinion as to course of treatment but has not alleged deliberate indifference. (Doc. 36.)

On January 28, 2015, United States District Judge Nancy G. Edmunds referred all pretrial matters to the undersigned magistrate judge. (Doc. 9.) The Defendant's motion is ready for report and recommendation without oral argument. *See* E.D. Mich. LR 7.1(f)(1).

2

B.      **Summary Judgment Standard of Review**

A motion for summary judgment will be granted under Rule 56 of the Federal Rules of Civil Procedure when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has "'the initial burden of showing the absence of a genuine issue of material fact' as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v Catrett*, 477 U.S. 317, 323 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v.*

*American Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the nonmoving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a *pro se* party's arguments are entitled to liberal construction, "this liberal standard does not, however, 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D. N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

    **C.    Analysis and Conclusion**

In *Estelle v. Gamble*, the Supreme Court held "that deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment Cruel and Unusual Punishment Clause

4

because it constitutes the "unnecessary and wanton infliction of pain'" and is "repugnant to the conscience of mankind" by offending our "evolving standards of decency." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 97, 104 (1976)). To establish a cognizable claim, Plaintiff's allegations must show Defendant's 'sufficiently harmful' acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,' and therefore will not violate the Constitution." *Id.* The 'deliberate indifference to a serious medical need' inquiry incorporates objective and subjective elements into a two-pronged standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The objective inquiry is whether the deprivation was "sufficiently serious" and the subjective prong considers whether the state of mind of the official was sufficiently culpable. *Id.*

The Sixth Circuit distinguishes between allegations of complete denial of medical care and inadequate medical treatment. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). "'Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Brock v. Crall*, 8 Fed. App'x 439, 441 (6th Cir. 2001) (quoting *Westlake*, 537 F.2d at 860 n.5.) A "difference of opinion between a plaintiff and his doctor regarding his diagnosis and treatment do[es] not state an Eighth Amendment claim." *Smith v. Sator*, 102 F. App'x 907, 909 (6th Cir. 2004) (citing *Estelle*, 429 U.S. at 107). Disagreement over the course or method of treatment also fails to state a claim under the Eighth Amendment. *Burton v. Kakani*, 514 F. App'x 577, 578-79 (6th Cir. 2013).

For purposes of this motion, I assume that Plaintiff's heart condition was a sufficiently

serious medical need or, at the very least, that he has shown that a genuine issue of material fact exists about whether his condition was sufficiently serious. The only question left then is whether Plaintiff has established a genuine issue of material fact as to whether Defendants acted with a sufficiently culpable state of mind, i.e., deliberate indifference, for the claim's subjective component.

In the instant case, Plaintiff's complaint acknowledges that his claim is one based on a disagreement with the method of treatment when he alleges that "Defendants, although providing some measure of care and treatment, have render[ed] inadequate care or have made the decision to take an easier less efficacious course of treatment, this subjecting the Plaintiff to unnecessary and wanton infliction of pain and suffering." (Doc. 6 at ID 36.)

The amended complaint further delineates a recitation of facts which are largely undisputed and which detail the ongoing and thorough care Plaintiff received. Plaintiff alleges that his symptoms of palpitations and sweating began in April of 2013, he notified health care, he was "assessed by a nurse[,]" given an EKG which showed atrial fibrillation, and was immediately "sent to the ER at Bixby Medical Center where physicians treated his arrhythmia using IV medications." (Doc. 6 at ID 23.) Upon return to ARF, Plaintiff "was seen by PA R. Jindal [who] reviewed the hospital records . . . and ordered the medications that had been changed." (Doc. 6 at ID 24.) Plaintiff's next symptoms occurred on September 15, he reported his symptoms to health care, was assessed by a nurse, and an EKG was performed, which showed atrial fibrillation. (*Id*.) Plaintiff was "again taken to Bixby Medical Center" when his condition was stable, he was "transferred to Allegiance Health in Jackson, Michigan to be monitored and further evaluated." (*Id*.) He was evaluated by a cardiologist, Dr. Rajuendra Metha, an echocardiogram was obtained, and Plaintiff

met with Dr. Metha again. (*Id*.) Plaintiff alleges that Dr. Metha recommended he take coumadin and that he "be evaluated by an Electrophysiologist to determine whether he was a candidate for ablation." (*Id*.) Plaintiff returned to ARF on September 17, was 'again seen by PA Jindal who prescribed coumadin, however, she did not think Plaintiff needed to see a specialist." (*Id*.)

Plaintiff was transferred to JCF in October 2013. (Doc. 6 at ID 25.) Plaintiff was screened by a nurse practitioner and was referred to Dr. Charles Jamsen. (*Id*.) "On November 1st the Plaintiff had the first of many chronic care appointments with Dr. Jamsen." (*Id*.) Plaintiff's pacemaker was readjusted, and one week later he was sent "for an appointment with Dr. Bipin Ravindran, an Electrophysiologist with Michigan Heart." (*Id*.) According to Plaintiff, Dr. Ravindran "believed the Plaintiff to be an excellent cand[i]date for ablation strategy, he had concerns about a previously diagnosed cardiac problem and deferred treatment of that to Dr. Metha." (*Id*.) Dr. Ravindran prescribed heart rate and anticoagulant medications.(*Id*.)

In December, Plaintiff was seen by Dr. Jamsen who told him that "the specialist stressed that Plaintiff be on an anticoagulant, which the Plaintiff had refused since coming to JCF . . . [and] that until the Plaintiff was taking the coumadin as prescribed, that he would not follow the other recommendation of the specialist." (*Id*.) Plaintiff does not contest the fact that he was not taking his anticoagulant medication, i.e., coumadin. Plaintiff filed a grievance "regarding Dr. Jamsen's refusal to consider [the anticoagulant medication] Xarelto like the specialist recommended instead of coumadin, which had caused the Plaintiff severe headaches and other problems." (Doc. 6 at ID 26.) At Plaintiff's January appointment with Dr. Jamsen, "[b]ecause the Plaintiff was still refusing to take coumadin and insisting that he be prescribed Xarelto, Dr. Jamsen refused to discuss the specialist's recommendation any further." (*Id*.) On January 16, Plaintiff's request for Xarelto was

7

"approved, however, d[ue] to the cost, the Plaintiff would have to be placed on the restricted medication line." (*Id.*) Plaintiff was seen by Dr. Jamsen in February and Dr. Jamsen recommended Plaintiff's pacemaker be checked and it was checked at Michigan Heart that month.

In March, Plaintiff had more symptoms and he was sent to the emergency room at Allegiance Health. (Doc. 6 at ID 27.) On the next day, Plaintiff was evaluated by cardiologist Dr. Bischan Hassunizadeh, who told Plaintiff "that there was nothing that he, or any other Cardiologist, can do for him because they had already tried medical management . . . [and] explained that Plaintiff's problem was 'electrical' and that he was asking a specialist in Electrophysiology to see him." (*Id.*) An electrophysiologist, Dr. Jin Han, with Michigan Heart told Plaintiff that "because of the frequency of the episodes of A-fib, that curative radio frequency ablation was needed." (*Id.*) When Plaintiff returned to JCF, he was seen by Dr. Karen Rhodes, chief of medicine, who "would discuss the recommendations for the procedures with Dr. Jamsen." (Doc. 6 at ID 28.) "Dr. Jamsen informed the Plaintiff that the procedures had been denied by Dr. Papendick at Corizon, and that he wanted to see if the [S]otalol would resolve Plaintiff's arrhythmia." (*Id.*) In April, Dr. Jamsen told Plaintiff that he would be transferred to Duane Waters Hospital (DWHC) and that he "had arranged for him to be evaluated by Dr. Whiteman and that he would be able to obtain the approval for an ablation if he opined that one was necessary." (*Id.*) Plaintiff then alleges that "[h]aving learned that Dr. Whiteman was not an Electrophysiologist, the Plaintiff viewed this need 'for a second opinion' as an excuse to further deny what he had been told was a cure and he again refused the transfer." (*Id.*) Thus, Plaintiff refused to be seen by Dr. Whiteman. Plaintiff then filed a grievance, the response to which indicated that "'Per Dr. Whiteman, patient is not a candidate for cardiac ablation.'" (Doc. 6 at ID 29.)

Plaintiff was "sent again to the ER at Allegiance Health" in May, and was then evaluated by another Cardiologist, Dr. Tareq Baghal, who recommended "a consult with an Electrophysiologist[.]" (*Id.*) Two days later, Plaintiff was evaluated by "Dr. Radmira Greenstein, an Electrophysiologist[.]" (*Id.*) Dr. Greenstein "could not determine the cause of the Plaintiff's discomfort" and wanted "to rule out that it may be a pacemaker related problem[.]" (*Id.*) Before discharge, Dr. Daniel Rashid met with Plaintiff and informed him that "Corizon had approved an AV junction ablation and that the Plaintiff will be sent to DHWC while the scheduling of the procedure at St. Joe's in Ann Arbor, was completed." (*Id.*)

Plaintiff alleges that while "waiting to be admitted into DHWC[.]" he was seen by Dr. Ryan Smith who contacted a Dr. Ricky Coleman who "instructed Dr. Smith to proceed with Plaintiff's admission" but who also recommended that "the ablation scheduling should be expedited." (Doc. 6 at ID 30.) Dr. Terrence Whiteman, however, visited Plaintiff and told Plaintiff "that he did not require an ablation as noted by Dr. Greenstein, and that he wanted Plaintiff to discontinue soltalol because it has a 'high mortality rate' and that he would order that he be taken to the DWHC ER and given amiodarone." (*Id.*) Plaintiff had symptoms of ventricular tachycardia and was sent to "McLaren Greater Lansing Hospital to be evaluated by a Dr. Thakur." (*Id.*)

At McLaren, Plaintiff was evaluated by Dr. Alyssa Churchill, and Dr. Shau who believed Plaintiff's pacemaker was malfunctioning. (*Id.*) Therefore, Plaintiff's pacemaker was reprogrammed. (*Id.*) A heart catheterization and stress test were performed and after having reviewed the results, "Dr. Shau met with the Plaintiff to inform him that surgery was not needed and that he was changing Plaintiff's medication regimen." (*Id.*) Plaintiff complained that the medications "had made him feel extremely uncomfortable" and that he "wanted Dr. Shau to order

9

that his pacemaker be programmed back to the settings prior to his admission and that he be discharged back to prison." (*Id*.) Then "Dr. Shau although visibly upset, had his pacemaker reprogrammed and authorized his discharge." (*Id*.)

Plaintiff was "admitted ag[a]in into DWHC[,]" and was "seen by Dr. Lynn Larson, who informed him that Dr. Whiteman had determined that Plaintiff did not need an ablation and that he could be managed with medications." (*Id*.) Plaintiff was returned to JCF. Plaintiff was seen by various health care providers and was continued on various prescription drugs, with some reactions that were attended to and his medications were adjusted. (Doc. 6 at ID 32-33.) In July, Dr. Baghal indicated that "he was going to contact Corizon to see if they would approve an ablation." (Doc. 6 at ID 33.) Three days later, "Dr. Jamsen made it clear that both he and Dr. Whiteman were convinced that he did not require an ablation, and concluded, that the reason for his episodes of A-fib was because he was not compliant with the medications that had been prescribed" and that "to ensure compliance all of the Plaintiff's medication were being restricted, and should he continue to complain about A-fib, the Plaintiff would be admitted into DWHC." (Doc. 6 at 34.) Plaintiff continued to complain and in August, Plaintiff was "taken to the Offices of McLaren Cardiology group in Lansing" despite Plaintiff having "voiced his objection . . . because of the bad experiences that he had with the Cardiologist affiliated with the practice[.]" (*Id*.) When in the McLaren office, Plaintiff "voiced his objections again, and the doctor informed the guards who escorted him that he could leave." (*Id*.) Later on that month, Plaintiff was notified that Drs. Jamsen and Rhodes had "issued written orders that the Plaintiff was not to be sent to an emergency room without first consulting a medical provider." (Doc. 6 at 35.)

Defendants Drs. Whiteman and Jamsen "testified that they have treated Plaintiff to the best

10

of their abilities" and that treatment was "consistent with the treatment Plaintiff would receive if he were not incarcerated." (Doc. 24 at ID 150.) In addition, they testified that "there is no Corizon policy, procedure, or custom to deny inmates needed medical care." (*Id*.)

I suggest that Plaintiff's allegations alone show that he was given extraordinarily prompt and thorough medical care, his requests were catered to on nearly every occasion, and that the only medical treatment he desired but did not receive was the ablation. None of Plaintiff's many doctors recommended ablation other than, as Plaintiff alleged, a Dr. Ricky Coleman who was not one of Plaintiff's treating physicians. Even if he were, one dissenting physician does not a constitutional violation make. *Mitchell v. Hininger* 553 Fed. App'x 602, 605 (6th Cir. 2014) (differences of opinion between prison doctors and a specialist's recommended treatment did not establish deliberate indifference.) Plaintiff's disagreement with his doctors' decisions regarding the manner in which his heart condition was treated falls far short of deliberate indifference to his medical needs. I therefore suggest that Defendants' motion for summary judgment be granted. *Palmer v. Ohio State University Medical Center*, 47 F. App'x 724, 725 (6th Cir. 2002) (affirming dismissal where plaintiff argued that the "heart operation he received was more invasive and otherwise different from the operation to which he had consented" because he "even though he may have disagreed with the treatment . . . he has alleged no more than a medical malpractice claim that is not cognizable under 42 U.S.C. § 1983."); *Allman v. Correct Care Solutions*, No. 3:14CV-P707-DJH, 2015 WL 128064, at *3 (W.D. Ky. Jan. 8, 2015) (dismissing Eighth Amendment claim where plaintiff saw a cardiologist and received medical treatment for his heart condition despite his allegations that his condition worsened due to inadequate medical care).

For all the reasons stated above, I recommend that Defendants' Motion for Summary

Judgment be granted.

### III. REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: November 30, 2015            S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge

### CERTIFICATION

     I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record. A copy was also sent via First Class Mail to Arthur Blank #157960 at C.E. Egeler Correctional Facility- DWHC, 3855 Cooper Street, Jackson, MI 49201.

Date: November 30, 2015           By s/Kristen Krawczyk
Case Manager to Magistrate Judge Morris